JOHN HOPKINS administrator of SARAH HOPKINS, who was trustee of JAMES HOPKINS, *against* JOHN WILSON and JAMES ARMOUR, executors of ROBERT ARMOUR, deceased.

Payment of a bond in continental currency to the administrator of a guardian, good against the minor.

THE plaintiff declared in debt for 300*l.* as follows:

John Wilson and James Armour, &c., were summoned, &c. And whereupon, the said John Hopkins administrator of the said Sarah Hopkins, who was trustee of the said James Hopkins (the same John being herein made a party by and at the instance of the same James the *cestui que trust*) by Charles Smith his attorney saith, that whereas the said Robert Armour in his life-time, to wit, on the 20th April 1773, at the county aforesaid, by his certain writing obligatory sealed with his seal, acknowledged himself to be held and firmly bound to the said Sarah in his life-time in the sum of 200*l.* parcel of the said 200*l.* to be paid to the said Sarah (for the use of the same James) when he should be thereunto required. And whereas, &c. (setting out a second obligation for 100*l.* bearing date the 28th April 1772, *ut supra,*) the said 300*l.* being the proper moneys of the same James, of which the said Robert Armour in his life-time, to wit, on the days aforesaid, at the county aforesaid, had notice from the said Sarah the trust thereof being expressed and declared in the bodies of the said writings obligatory respectively, yet the said Robert in his life-time, and the said John Wilson and James Armour since the death of the said Robert or either of them, have not paid the said 300*l.* to the said Sarah Hopkins in her life-time, nor to the said James Hopkins since her death, nor to any person duly authorized by law to receive the same, but the same to them or either of them to pay the said Robert Armour in his life-time did altogether refuse, and the said John Wilson and James Armour since the death of the said Robert do still refuse, to the damage of the said plaintiff 100*l.* and therefore he brings suit. And the said James Hopkins avers, that the said writings obligatory after the death of the said Sarah on the 2d February 1778, at the county aforesaid, (the same James then being a minor under the age of fourteen years) casually came to the hands and possession of the said John Hopkins; and that the said Robert Armour afterwards on the 18th April 1778, the said 300*l.* being unpaid, unlawfully, unjustly and fraudulently obtained and procured the said writings obligatory from the said John Hopkins, and received the same into the hands and possession of him the said Robert, without the knowledge and consent

the said James Hopkins, or of any person legally authorized to act for him, and without paying the same James, or any person legally authorized to act for him, the said sum of 300*l.* or any part thereof, and this he is ready to verify. And the said James Hopkins brings into court here the letters of administration granted to the said John Hopkins by the register of Lancaster county aforesaid, on the estate of the said Sarah Hopkins, whose date is the second day of February in the year last aforesaid, by which it manifestly appears that the said John Hopkins is the administrator of the said Sarah Hopkins, &c. Pledges, &c.

Plea payment, replication *non solvit* and issue.

Sarah Hopkins administered on the estate of her husband John Hopkins deceased, and the moneys lent on these bonds, were part of the distributive share of James Hopkins of his father's property. One of the bonds was produced by the defendants in court, which appeared to be payable to the said Sarah, her executors, administrators and assigns, for the use of her son James. On the 6th August 1772 the said Sarah Hopkins and James Clemson were appointed guardians by the Orphans' Court over the estate of the said James Hopkins, then a minor.

It was admitted, that both of the bonds were discharged by Robert Armour in continental money in the month of April 1778, and were then delivered up by the said John Hopkins and cancelled.

On the part of the plaintiff, it was insisted, that the payment to John Hopkins was not good in law, though it would have been good to his mother. He was not the guardian of his brother James, who was then under the age of fourteen years. The trust was expressed on the face of the bonds, and the obligor was bound to take notice of it. It is evidently a hard case, when the debtor pays only one sixth part of his creditor's demand; and if the court are not bound by the strict letter of the law, they will go every justifiable length to obtain justice.

The following authorities were relied on. Payment of a legacy to a father, which has been devised to his children is bad, though the testator on his death bed by parol directed it. 1 Wms. 285. The goods of a testator in the hands of his executor cannot be seized in execution of a judgment against the executor in his own right, and the sheriff is bound to make inquiry to whom the goods belong. 4 Term. Rep. 621, 648. If an executor becomes bankrupt, the specific property of the testator cannot be seized by the commissioner of bankrupt. 3 Burr.

1369. 4 Term Rep. 648. If a trustee sells for a full consideration to one having notice of the trust, and the purchaser levies a fine, the *cestui que trust* is not bound to enter within the fifth year, Equ. Ca. Ab. 256, pl. 6. Payment to a scrivener not having the bond, held not good, though he had received the interest before. 1 Vern. 150. If one has an equitable title to goods on board a ship, and another knowing of such title, gets an indorsement of the bill of lading, he cannot recover such goods in trover, but the captain will be justified in delivering the goods to the person having the equitable title. Peake, 189. Payment of money to a trustee with notice of the trust, is a mispayment, though the trustee had judgment and execution against the payer. Vern. 197, 198. A trustee empowered to receive and pay money delivers over the bond to the *cestui que* trust, payment to the trustee without obligor's seeing the bond, is bad. 2 Vern 539.

The defendant's counsel observed, that the declaration was perfectly novel. In some parts of it James Hopkins is considered as the plaintiff; in others, his brother John assumes that character. The payment made is sanctified by law, and it would be highly dangerous to impeach such transactions during the late war. The amount of the plaintiff's doctrine is that though John Hopkins only could enforce the payment of this money, after his mother's death, as he is attempting to do even in the present instance, yet he is not competent to receive it, or surrender up the obligations. Who else could not bring the suit? or what species of declaration could be filed by a stranger without privity of contract? If on a bond executed to the guardian of a minor, the amount can be paid only to a person in that capacity, how could the debtor discharge the demand in case of the death of the obligee? He could not apply to the Orphans' Court for the appointment of a new guardian. However ready and willing he might be to pay the debt, he must be still subjected to the payment of new interest!

By the court. The obligations now in suit were made payable to Sarah Hopkins, her executors administrators and assigns. The obligor tendered the money in continental currency to John Hopkins her administrator, who under the express terms of the contracts, was empowered to receive the same after his death. The congress and different* legislatures of the United States have made continental

---

* Vide Acts of Pennsylvania passed 29th January 1777—13th June 1777 and 25th May 1778, which appears to be the last law making bills of credit emitted by congress a legal tender. 1 Dall. St. Laws, 770.

money a legal tender on the grounds of policy and public conven-
ience. We are not empowered to remedy the hardships introduced
by measures of necessity. Unquestionably many cases have occur-
red to minors, peculiarly hard. But the laws must govern both
courts and juries. Under the depreciation act of 3d April 1781,
1 Dall. St. Laws, 882, auditors are restricted from reducing a par-
tial payment made in money then current; and this law has
always been held binding on juries. To unravel and weigh the
payments made in the continental bills of credit during the, would
introduce great confusion, and be dangerous in the extreme. These
obligations were not made payable to Sarah Hopkins, as one of the
guardians of her son *eo nomine*. Her son John came to the posses-
sion of them legally and not casually, as his mother's representative;
with such lawful possession, a payment to him was good under the
cases which have been cited. After his mother's death, while the
bonds remained unassigned over, actions on them could only be
maintained in his name.

If he had refused the receipt of the continental bills of credit, a
suit might have been supported against him for the amount. If he
has acted improperly, (of which we have not the most distant idea,)
in delivering up the obligations the proper remedy would be against
him.

Verdicts for the defendants.

Messrs. McKean and C. Smith, *pro quer*.
Messrs Kittera, Montgomery and D. Moore, *pro def*.